UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN COLANTONIO,<br>Defendant. | Criminal Case No. 24-CR-00101-JJM-PAS |

UNITED STATES' SENTENCING MEMORANDUM

**"The attack on African-American churches is more than just an act of terrorism against a place of worship…It is an attack on the very soul of the African-American community. It is the source of their sense of humanity, their sense of self-worth, their fight for dignity and equality, their leader and trainer in the struggle for freedom of justice."**

- Ozell Sutton, Chair of the Justice Department's Community Relation Service Church Burning Response Team (1996)

## I. INTRODUCTION

On February 27, 2025, Kevin Colantonio ("Defendant" or "Colantonio"), appeared before the Court, waived indictment, and pleaded guilty to an information charging him with Count 1: Obstruction of Free Exercise of Religious Beliefs, in violation of 18 U.S.C. § 247(a)(2), Count 2: Malicious Damage by Means of Fire, in violation of 18 U.S.C. § 844(i), and Counts 3 & 4: Assault of a Federal Officer, in violation of 18 U.S.C. § 111(a). Sentencing is scheduled for June 5, 2025.

The Presentence Investigation Report (PSR), *ECF* Dkt. #41, calculates his Guideline Sentencing Range using a total offense level of 26, having received a 3-level

increase under USSG §3A1.1 for hate crime motivation, PSR ¶ 25.

With a calculated Criminal History Category of I, the PSR sets Defendant's guideline imprisonment range at 63 - 78 months.

There is a Plea Agreement in this matter. The United States recommends that the Court sentence Defendant to term of 78 months incarceration to run concurrently on all counts of the Information, followed by 3 years of supervised release and $400.00 in mandatory Special Assessments. Imposition of such a sentence is sufficient, but not greater than necessary, will reflect the seriousness of the offense, provide just punishment, deter further crimes, and protect the public.

**II. FACTS**

Paragraphs 9 – 16 of the PSR lay out the facts of the matter in explicit detail.

On February 11, 2024, at approximately 12:12 AM, members of the North Providence Police Department ("NPPD") and North Providence Fire Department ("NPFD") were dispatched to Shiloh Gospel Temple located at 974 Charles Street North Providence, RI for the report of an individual attempting to set the building on fire. Shiloh Gospel Church is a predominantly black church with an in-person congregation as well as an online following.

Upon arrival, NPPD Patrolmen observed five active flames around the exterior of the church. While awaiting arrival from the NPFD, NPPD Patrolmen used their assigned patrol vehicle fire extinguishers to extinguish the flames, which they were able to do. The fire caused damage to the church. Due to the damage, church congregants were prevented from enjoying their free exercise of religious beliefs as church services

were cancelled until the church could be reopened.

Witness accounts and video footage indicated a male with a gas can ignited the




fires at the church. The investigation lead law enforcement to a nearby Cumberland Farms where they were able to obtain video footage and records showing that Colantonio purchased $10 worth of gas and a Bic lighter minutes before the arson occurred. Colantonio then traveled on foot from the Cumberland Farms to the Shiloh Gospel Church.

Prior to the start of the fire on February 11, 2024, on Saturday February 10, 2024, at approximately 10:15 pm, the NPPD received a call for service from the pastor of Shiloh Gospel Temple Ministry. The pastor indicated he was on a flight returning from South Carolina and while on the plane, he used his cellular device to remotely access his Ring camera doorbell which was affixed to the exterior of the church. While viewing the video, he observed a male subject with light skin, and what appeared to be a mask below his nose. The pastor reported that the subject was trying to break into the church.

The pastor spoke to the male subject through the Ring camera, telling him, among other things, that the building was a church. The male subject continued trying to break in the door, and then broke the Ring camera off the side of the building. The pastor was shown a picture of Colantonio and positively identified Colantonio as the person he viewed on the Ring camera.

On February 15, 2024, a search warrant was executed at Colantonio's apartment. An accelerant detection canine had a positive reaction on several items of seized clothing. These items matched the clothing Colantonio was wearing on the night of the arson, based upon surveillance footage.




During the search of Colantonio's residence, authorities also seized notebooks with hateful writings, including one entry in which Colantonio wrote, "The age of false churches target side operation. Eliminate Rich Snob global Elite Pastors, burn churches down to ground, when congregants move to next church, do the same . . . ."

The Age of False Churches & Target Side operation

Eliminate Rich Snob global Elite pastors
Burn Churches down to ground, when congregants move to next church, Do the same.. they will get the hint that maybe church isn't for them, will scramble around like idiots

In a separate entry, Colantonio wrote, "hunt them down gun everyone down that isn't white, if one is white spread the gospel. Always give our bloodline a chance."

When they run to tell others, hunt them down
gun Everyone Down that isn't White, If one is White
Spread the Gospel. Always give our Bloodline
A Chance. ~~If they~~

On February 12, 2024, Colantonio privately messaged a family member that no one in the community cared about the arson; Colantonio called the church "Athiest God mockers," adding that, "They're busy dancing around collecting money." Colantonio, has been detained at the Donald W. Wyatt Detention Facility since February 15, 2024.

While at the Wyatt, on March 4, 2024, Officer Waite started to deliver breakfast in the Special Management Unit. As he approached the Defendant's cell, G-3, Officer Waite opened the food trap to offer Colantonio coffee. Colantonio grabbed his cup from around the sink area and behaved as if he was going to get some coffee. Instead, Colantonio, threw the cup at Officer Waite, also striking a second officer, Officer Bertrand, which caused the substance inside to hit both officers. The government notes

that Officer Waite is a man of color. The substance in Defendant's cup was a mixture of feces and urine. The incident was captured by surveillance video.

**III. LEGAL PRINCIPLES**

As the Supreme Court explained in *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007), the district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range, and then consider all the factors in 18 U.S.C. § 3553(a)[1] to determine whether they support the sentence requested. The district court may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented. *Id*. at 597.

If the district court determines that a non-Guidelines sentence is warranted, the

---

[1] (a) Factors to be considered in imposing sentence. – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purpose set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider -

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed -

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentence available;

(4) the kinds of sentence and the sentencing range established for -

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;

(5) any pertinent policy statement -

(A) issued by the Sentencing Commission ...;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7).

court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance." *Id*. Obviously, a major departure requires greater justification than a minor deviation. *Id*. The district court's explanation must allow for appropriate appellate review and promote the perception of a fair sentencing. *Id*.

In this case, a sentence of seventy-eight months sentence will adequately address the statutory sentencing goals articulated in 18 U.S.C. § 3553(a). As the Supreme Court observed in *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007), the sentencing judge and the Sentencing Commission are carrying out "the same basic 3553(a) objectives, the one at retail, the other at wholesale." In other words, the Sentencing Commission's Guidelines are a "rough approximation of a sentence that might achieve § 3553(a)'s objectives." *Id*. at 2465. *See Gall*, 128 S. Ct. at 596 (stating "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and initial benchmark.").

**IV. ARGUMENT**

The United States respectfully submits that a sentence of seventy-eight months imprisonment is sufficient, but not greater than necessary, to achieve the sentencing objectives delineated in 18 U.S.C. § 3553. A sentence at the top of the guideline range is warranted based upon the Defendant's actions. Seventy-eight months adequately reflects the seriousness of the Defendant's conduct and if imposed, this sentence, hopefully, will deter the Defendant from committing another criminal offense in the future. *See* § 3553(a)(2)(B).

**A. The Nature and Circumstances of the Offense**

The seriousness of the Defendant's offenses, as evidenced by the harm the Defendant threatened to cause – and caused – supports a sentence of imprisonment. Here, the Defendant threatened an entire congregation with violence based on his hatred for its religion and people by attempting to burn the church to the ground. Although no one was physically injured, the Defendant's threat and hate-filled message nevertheless caused real harm to the congregants of Shiloh Gospel Temple.

The following statements from church parishioners make clear the impact this crime has had on them:

*"The attack shattered that sense of safety and belonging, replacing it with fear, pain, and anger. Elders who had worshiped there for decades felt like their history was being erased, while the younger members struggled to understand why such hate still exists"*

*"Church should be a place of peace, comfort, and sanctuary. What took place has shaken our community to its core. It has made us realize just how vulnerable we are when hate walks through the doors."*

*"That incident – an attempt to burn down our church – shook me to my core. It was more than just an attack on a building; it was an attack on our faith, our safety, and our right to worship freely."*

*"We should be able to worship without being afraid for our lives. We should be able to worship knowing that we can do so freely and safely."*

Arson is one of the most dangerous crimes in which a Defendant can engage -- the risk arson poses to the public and first responders is unparalleled. Here, the

Defendant set five separate fires, not one, indicating his desire to do significant damage to the church at 974 Charles Street. Fortunately, the police responded quickly and were able to extinguish the flames before they spread. However, the fact that the police department would timely arrive on scene were not factors known to the Defendant at the time he set the fires. The Defendant not only committed arson but targeted the church because of the race of the people who congregated there. In civilized society this is not acceptable and must be met with severe punishment.

Separately the Defendant threw feces at correctional staff, who were just performing their duties. The officer was offering Colantonio coffee when, with a pre-planned attack, Colantonio threw the concoction of feces and urine at the officers striking them.

In short, the Defendant's actions on February 11, 2024, were hateful, intentionally violent, destructive, potentially life threating, and targeted a group of people because of their race and religion. Defendant's actions on March 4, 2024, were repulsive and premediated. All of these facts warrant a 78-month sentence.

**B. The History and Characteristics of the Defendant**

The fact that the Defendant has mental health diagnoses is not disputed. However, that fact does not excuse his conduct underlying his arson offense or his assaults, nor does it adequately explain his actions targeting a group of people because of their race and religion. The Defendant currently presents a significant danger to others and a sentence of 78 months is necessary in order to adequately protect the public.

**C. The Need For the Sentence Imposed to Reflect the Seriousness of the Offense, To Promote Respect for the Law and to Provide Just Punishment for the Offense**

"In 2023, local fire departments responded to an estimated 1.39 million fires in the United States. These fires caused an estimated 3,670 civilian fire deaths and 13,350 reported civilian fire injuries. The property damage caused by these fires was estimated at $23 billion. On average, a fire department responded to a fire somewhere in the US every 23 seconds in 2023. A home structure fire was reported every 95 seconds, while a home fire death occurred every three hours, and a home fire injury occurred every 52 minutes." https://www.nfpa.org/education-and-research/research/nfpa-research/fire-statistical-reports/fire-loss-in-the-united-states

"The year 2023 saw more acts of hostility against churches than any of the previous five years, continuing an upward trend. According to Family Research Counsel's monitoring of publicly available data, at least 436 acts of hostility against churches took place between January and November 2023."
https://www.frc.org/issueanalysis/hostility-against-churches-is-on-the-rise-in-the-united-states

Congress has determined that the risk arson presents to the public warrants a sentence of at least 60 months. Here, where the Defendant's arson was racially motivated and he committed an additional assault while in prisons, sentence of seventy-eight months incarceration is just punishment for the offense. Fires are destructive by nature and involve many sectors of the public, not just private entities. Fire personnel, emergency medical personnel, law enforcement, public utilities and

insurance companies are involved in responding to and the investigation of fires. The Defendant's arson was directed at a house of worship, specifically targeting a group of people because of their race and religion.

The risks posed by Defendant's actions cannot be overstated and a sentence of 78 months is appropriate to reflect the seriousness of the offense, promote respect for the risks that arson presents, the cost to public and private entities inherent in dealing with arson cases, and adequately punish the Defendant for his heinous racially motivated conduct.

### D. The Need to Afford Adequate Deterrence to Criminal Conduct and To Protect the Public From Further Crimes of the Defendant

Since his arrest, the Defendant has continued to engage in criminal and dangerous conduct and his actions underscore the need to protect the public from additional crimes committed by him. A sentence of 78 months will both provide the deterrence needed to ensure he does not continue to engage in criminal conduct and protect the public from further crimes of the Defendant.

### E. The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

The PSR details extensive attempts to secure the necessary mental health treatment essential to increasing the likelihood that the Defendant will live a law-abiding life. An extended period in Bureau of Prisons' custody where the Defendant will continue to receive regular behavioral and mental health treatment will undoubtedly be of significant benefit to him and reduce the risk of recidivism once he is

released. In addition, the United States recommends a three-year period of supervised release, along with the conditions of supervision outlined in the PSR, during which he will continue to undergo Court ordered mental health treatment.

**CONCLUSION**

After consideration of the Sentencing Guidelines, the § 3553 factors, and the information contained in the PSR concerning Defendant's background and characteristics, the United States recommends that the Court sentence Defendant to 78 months in custody, to be followed by 3 years of Supervised Release, under the conditions recommended by the Probation Office, with $400 in Special Assessments.

Respectfully Submitted,
UNITED STATES OF AMERICA
By its attorneys,

SARA MIRON BLOOM
Acting United States Attorney

PETER I. ROKLAN
Assistant U.S. Attorney
One Financial Plaza, 17th Floor.
Providence, RI 02903
peter.roklan@usdoj.gov
Tel: 401-709-5031

**CERTIFICATE OF SERVICE**

I, hereby certify that on this 3rd day of June 2025, I caused this document to be electronically filed with the United States District Court for the District of Rhode Island, using the CM/ECF System.

PETER I. ROKLAN
Assistant U.S. Attorney